Thomas v. Kenyon.

## James Thomas *v.* Amasa Kenyon.

The defendant's ground was higher than the plaintiff's, and its natural slope was such, that the water rising from natural springs beyond, following the declivity of the ground, flowed into and collected in a hollow on defendant's lot, directly adjoining the plaintiff's house. At the time plaintiff purchased his lot, there was a drain and culvert which carried this water off from the defendant's lot, but which, before the commencement of this suit, had been cut off and filled up by owners of lots through which it had flowed. The water was thus thrown back upon the defendant's lot, and from thence flowed into the plaintiff's lot. Directly adjoining the plaintiff's house, and over it or close to it, the defendant had built a lumber shed, the roof of which pitched towards the plaintiff's house, from which, when it rained, the water ran in the direction of the plaintiff's building. The plaintiff, on his part, had erected wood sheds along the line of his own and defendant's lot, the roofs of which pitched towards the defendant's lot, and the water which fell upon it when it rained was precipitated upon the defendant's lot. The water thus collected by the natural declivity of the ground and the cutting off of the watercourse or drain and by the roofs erected by both the plaintiff and defendant, flowed into the plaintiff's lot, and frequently submerged the basement of his house, and washed away parts of its foundation.

*Held,*—1. That, although the defendant could not be held answerable for the effect produced by water flowing over his ground towards the plaintiff's lot, in consequence of the natural formation of the soil; yet, it appearing that the body of water on the defendant's lot was greatly increased by the lawful cutting off of the drain and culvert, and the filling in of adjacent sunken lots by their owners, obligations were imposed upon the defendant in respect to his own lot, which, but for other causes, would not have existed, and he was bound to adopt reasonable means to prevent the water from collecting and remaining on his premises.

2. The fact that the pitch of the plaintiff's roofs tended to augment the body of water which did the injury, does not deprive him of all right of action for the injury he sustained by reason of the defendant's erection.

The mutual or co-operating negligence which deprives one party of any right of action against the other, is where the act which produced the injury would not have occurred but for the combined negligence of both.

Where the effect of the negligence of one party is to produce injury to a certain extent in any event; that is, if its effect is to produce a certain amount of injury, even if the other party had been guilty of no negligence at all, then, though the negligence of the other party may have rendered the loss

Thomas v. Kenyon.

or injury greater than it would otherwise have been, still they are not the joint authors of all that has taken place; and it is possible to distinguish the amount of injury caused by the negligence of the one, from the amount of injury caused by the negligence of the other.

And in such a case, the jury have a right to discriminate, and to hold a defendant responsible for damage arising from causes with which the plaintiff had no agency.

The dimensions of a roof being known, and the number and character of the rain-storms within a certain period being shown, the jury have data upon which they may determine the quantity of rain which was probably precipitated from the roof during that period.

And a question to a witness as to the quantity of such rain is wholly scientific, and being put to a witness who was not shown to be familiar with the laws which govern the subject, was properly excluded.

APPEAL by the defendant from a judgment entered at trial term on the verdict of a jury.

The action was brought by the plaintiff against the defendant, who were owners of adjoining lots, to recover damages caused by the negligence of the defendant in permitting water to run from his premises upon those of the plaintiff.

A part of the defendant's premises were sunken and inclined towards the plaintiff's. The complaint alleges that "the defendant has wantonly, wilfully, recklessly, negligently, wrongfully and maliciously permitted, and suffered divers large quantities of water to form and collect upon the sunken part of his premises, on the side nearest to the plaintiff, and to remain there, working its way and penetrating through the ground into and upon the plaintiff's premises, on the west side thereof, and so into, upon and through the basement of his said house, upon that side, overflowing the basement on that side, rotting and destroying the floor, wood-work and walls thereof, and the west wall and part of the north wall of the plaintiff's house, rendering the said basement on that side damp, uncomfortable, and absolutely unfit for occupation, softening the ground under the house, and in and about the foundation wall, on the west and a part of the north side of the house, weakening and endangering those parts of the foundation-walls, and so imparing and diminishing the strength and security of the plaintiff's said house.

Thomas v. Kenyon.

"That there has been, since the month of April, 1857, or thereabouts, a public sewer running through West 43d street, in front of plaintiff's and defendant's premises upon that street; and that, although the defendant has been, since that time, well aware of that fact, he has not made or established, and has not attempted to make or establish any connection between his premises and the said public sewer, for the purpose of draining or carrying off the water so forming and collecting upon his premises, and working and penetrating through, into and upon the plaintiff's premises as aforesaid.

"And the plaintiff further saith, that, during all the time, from the said thirteenth day of July, 1855, he has frequently called the attention of the defendant to the said water, and particularly to the injury resulting, as above stated, to the plaintiff's premises therefrom, and has fully acquainted him therewith, and has remonstrated against the conduct of the defendant, to him, personally, in permitting or suffering the said water so to damnify the plaintiff's property as aforesaid, and has requested the defendant to do something towards preventing the same, and to fill up the sunken portion of the defendant's premises, or make some sort of drainage, or adopt some mode of getting rid of the said water; and has offered himself, if permitted by the defendant, as a means of lessening the injury and annoyance to his (the plaintiff's) premises and property, to fill up the sunken portion of the defendant's premises on the side towards the plaintiff's premises; yet that the said defendant has neither done anything himself, nor caused anything to be done, nor permitted the plaintiff to do as he offered, towards or for the purpose of discontinuing the said injury to the plaintiff's premises and property, and preventing the same for the future, but has hitherto wholly omitted and neglected so to do, and has, during all the time last mentioned, wantonly, willfully, recklessly, negligently, wrongfully and maliciously kept and maintained the said nuisance upon his premises, to the serious detriment of the plaintiff, and with a full knowledge thereof."

Special damages are then alleged, and judgment demanded.

The grounds of defence appear fully in the opinion of DALY, F. J.

On the trial the Judge (BRADY) charged the jury as follows:

Thomas v. Kenyon.

1.  As a general rule, a man who exercises proper care and skill, may do what he will with his own property. He must not, however, under color of enjoying his own, set up or maintain a nuisance which deprives another of the enjoyment of his property.

2.  If a man uses his own property in such a negligent and improper manner as to cause an injury to another, he is responsible for that injury. Every man in the enjoyment of his property must have some regard or consideration for his neighbor.

3.  If the jury believe that the defendant erected a shed along the west gable wall of the plaintiff's house, as described in the testimony, (some twelve or more feet wide, and some eighty feet long, and some few feet from that wall, but sloping towards it, intended to protect the piles of lumber against the weather), and that the water falling upon this shed, ran off it and formed or collected on the ground near this wall, and was permitted to remain there an unreasonable time, and that the defendant was aware of it, and either did nothing to prevent any evil results therefrom, or resorted to no reasonable expedients with that view, in consequence of which the water so forming or collecting and remaining, percolated or strained through this wall, doing injury to it, and to other parts of the plaintiff's house, when the defendant, by exercising reasonable or ordinary care, could have averted these results, he is responsible to the plaintiff.

4.  The same principle would apply to the stable spoken of in the evidence, and any other erections upon the defendant's premises, if the jury believed that they occasioned injury to the plaintiff's house, under circumstances similar to those supposed in relation to the shed.

5.  If the ground of the defendant's premises was so sloped on the surface, as that the water falling thereon ran to and collected along the west gable wall of the plaintiff's house, and being permitted to remain there an unreasonable time, strained through that wall, injuring the house, and the defendant was aware of it, and wantonly or as the result of indifference or gross negligence, refrained from doing anything, or adopted no reasonable expedients to prevent the injury, when by the

Thomas v. Kenyon.

adoption of reasonable means on his part it could have been prevented, he is responsible to the plaintiff.

6. If the defendant permitted water to collect upon the surface of his premises, and wantonly or recklessly, or negligently suffered it to remain there until it strained through the earth and the west gable wall of the plaintiff's house, injuring the house, and the defendant knowing the fact, resorted to no reasonable expedients for the prevention of this injury, he is responsible to the plaintiff.

7. The defendant was bound to adopt reasonable means to prevent the water forming or collecting and remaining upon his premises an unreasonable time, and it is for the jury, as a question of fact, to decide or say what was, or would have been, an unreasonable time, and what reasonable means or expedients on the part of the defendant could have been taken to prevent injury to the plaintiff, and whether or not the defendant adopted or resorted to them.

8. If the defendant did not construct or erect the various alleged causes of injury to the plaintiff's house, it is for the jury to say whether he continued them during the time for which the plaintiff claims to recover, with a knowledge of their existence and that they were injurious to the plaintiff's property.

9. That if the jury believe the statement of the plaintiff to be true, that he had erected a shed on the west line of his lot, the roof of which projected over into the lot of the defendant, and the water which ran from it went to swell the water which came from defendant's lot into the basement of plaintiff's house, then the plaintiff could not recover, his own negligence contributing to the injury of which he complained. But if the jury further believed that the plaintiff's house would have been injured by the other water upon the defendant's premises without reference to the contributions they received from this source, in consequence of the defendant's gross negligence, in not trying to prevent the injury, the plaintiff was entitled to recover for the injury done to his house by the other waters from the defendant's premises, (distinct from those contributed by these wood-sheds), to the extent the jury believed that injury to have been done.

10. That the defendant in this cause was not responsible

for the wat street, and sponsible fo pipe, unless

The judg ion that the tion, and w commencen cover, beca his land in And furthe could recov by the evid damages.

The defen where the fault is nat

The judg charged.

The jury motion for appealed to

*John H.*

*John Gr*

DALY, F. and which wall of the over the d into and u and rende chiefly or cutting off of sheds t dant.

The pla was the lo northerly

Thomas v. Kenyon.

for the water which passed over his premises from Forty-fourth street, and reached the lot of the plaintiff, nor would he be responsible for water which came from a bursted hydrant or pipe, unless the hydrant or pipe was on his premises.

The judge also charged the jury, that if they were of opinion that the lot of the defendant remained in its natural position, and was in such position at the time of, and before the commencement of this action, the plaintiff could not recover, because every person has a natural right to the use of his land in the situation in which it was placed by nature. And further, that if the plaintiff was entitled to a verdict, he could recover only to the extent of the actual injuries proved by the evidence, and was not entitled to general or exemplary damages.

The defendant's counsel requested the judge to charge that, where the claim is founded upon a private nuisance and the fault is natural, the plaintiff cannot recover.

The judge declined so to charge, except as he had already charged.

The jury brought in a verdict for the plaintiff; and a motion for a new trial having been denied, the defendant appealed to the general term.

*John H. White,* (*White & Lowry*) for appellants.

*John Graham,* for respondents.

DALY, F. J.—The water deposited on the defendant's lot, and which sank in close to the foundation of the west gable wall of the plaintiff's house, as well as the water which flowed over the defendant's lot towards the lot of the plaintiff, and into and upon the plaintiff's premises, injuring his building, and rendering the basement of his house untenantable, was chiefly owing to the natural formation of the ground, and the cutting off of existing water-courses, and in part to the erection of sheds upon the lots both of the plaintiff, and of the defendant.

The plaintiff's lot, before any building was erected upon it, was the lowest lot in the neighborhood. It is situated on the northerly side of west Forty-third street, between the Tenth

Thomas v. Kenyon.

and the Eleventh avenues, and the lot of the defendant, which adjoins it on the west, inclines or slopes toward it. To the north and west of the defendant's lot, the land is more elevated. This elevation extending as far as the Eleventh avenue and Forty-ninth street, with an easterly inclination or descent in the direction of the plaintiff's lot. Upon this higher ground in the vicinity of Forty-ninth street, there are natural springs, the water from which flows over the surface in an easterly direction, across the defendant's lot, and towards the lot of the plaintiff. In the fall and spring, these streams were more swollen than at other periods, discharging their waters over the surface, and the volume of water, which was largely increased when it rained, following the natural declivity of the ground, flowed in the direction of the plaintiff's lot. His lot being the lowest, water continually remained there, and before it was built upon, a pond existed in the front part of it, large enough, in the language of one of the witnesses, for ducks to swim in. After his building was erected, a drain was laid across the centre of his lot, uniting with similar drains upon the lots to the east of him, which connected with a sewer one hundred and seventy-five feet east of the defendant's lot. Fifty feet west of the plaintiff's lot there was also a culvert, upon the lot of one McKenna, which served to carry off the water flowing in a direction from plaintiff's lot. As persons commenced building in the immediate vicinity, they filled up or stopped the drain referred to, and the water therefore flowed over the surface, and when McKenna built, he set his house in the middle of the culvert, and thus shutting off this escape, the water flowed over the lots of the defendant and of the plaintiff. It does not appear from the evidence, that the defendant did anything to alter the natural situation of his lot, until a short time before the commencement of the suit, and what he then did had a beneficial effect, as it tended to diminish the volume of water which flowed across his lot in the direction of the plaintiff's premises. The body of water which from the natural formations ran towards the plaintiff's lot, was, especially during heavy rains, very great, descending with a force and quantity, sufficient, according to the statement of the witnesses, to turn two or three grist mills. There was a hollow in the defendant's lot directly adjoining the plaintiff's house, and over it or close

Thomas v. Kenyon.

to it, there was a pile of boards covered with a shed thirteen feet wide and forty feet long, the roof of which pitched toward the plaintiff's house, with a descent of seven inches, from which, when it rained, the water ran in the direction of the plaintiff's building, and remained there, the place being nearly always wet, even in dry weather. The plaintiff, on his part, had erected a wood-shed along the line of his own and the defendant's lot, the roof of which pitched towards the lot of the defendant. The roof of these sheds was four or five feet in width and about forty feet long, and the water which fell upon it when it rained was precipitated upon the defendant's lot, increasing the volume of water there deposited. The water, when it came in large quantities, completely submerged the plaintiff's basement, and the body of water saturating the ground alongside of the foundation of his building wore its way through the interstices of his foundation wall, washing away the mortar from between the stones, and making, in the language of a witness, a corn crib of the west end gable. In 1856, the Corporation commenced the construction of a sewer in Forty-third street, which was completed in August, 1857. In December, 1856, the plaintiff was allowed to connect with the sewer, as yet unfinished, but this did not afford complete relief, as the surface water still continued to flow towards his west gable wall, and plaintiff's basement still continued wet and unfit for habitation at the commencement of this suit in July, 1857. From July, 1855, until he connected with the sewer in Forty-third street in December, 1856, the plaintiff was compelled after every storm to have the water pumped out of his basement, which on such occasions rose two feet over the basement floor. The pumping took place two or three days in a week, and for two years the basement was never entirely free from water. Even after a suit was commenced, if a brick were taken up from the hearth, the water would rise and in half an hour be of the depth of six inches upon the basement floor.

The plaintiff purchased his house and lot in 1855, and from his own statement, was aware of its disadvantageous position in respect to the flow of water. In the summer or fall of that year, he asked the defendant if he would fill up his lot, or do something to prevent the water coming upon the plaintiff's premises; but the defendant refused, saying that he should do

as he pleased with his own land.    In the summer of 1856, the plaintiff asked him if he would sell his lot so that it might be drained, but he answered that it was not for sale.    In July, 1857, the plaintiff asked him why he did not connect with the sewer, and his answer was, that it would cost money, that if he wanted a connection for himself, he would put it in.    He was then shown the injury done by the water to the plaintiff's building, the cracks in the window-sills, the destruction of the walls, by the mortar coming out and dropping off, but he made no remark, and in a few days after, the plaintiff commenced this suit.

I have stated these facts, as they are essential to the full understanding of the question that we are required to pass upon. In view of the changes that had taken place in the neighborhood, it was certainly the duty of the defendant to do something to carry off the water which, in consequence of the cutting off of the previous water-course by the erection of buildings and otherwise, gathered upon his lot, sapping the foundation of his neighbor's building, and rendering the lower part of it uninhabitable. It does not appear upon the testimony whether the drain under the plaintiff's house, connecting with the sewer east of the defendant's lot and the culvert on the lot of McKenna, was or was not sufficient to carry off the water which from the natural formation of the ground flowed towards the plaintiff's lot, but it did appear from the defendant's own testimony, that when these water-courses were cut off by the buildings and improvements in the vicinity, the effect of it was to cause a large body of water to collect upon the defendant's lot. It collected chiefly in the hollow upon the lot previously referred to, immediately adjoining the west gable wall of the plaintiff's building. It was shown that by banking up earth upon the side of the lot he could have changed the direction of this water, or have carried it off by connecting with the sewer in 43d street, after the erection of that sewer had been commenced; and it cannot be that a party is justified in allowing water thus to collect upon his lot to the serious detriment and damage of his neighbor, when it is in his power, by a moderate expenditure, to turn it off. He was urgently requested to do something, even to sell his lot to the plaintiff, but persistently refused to do anything until he thought pro-

Thomas v. Kenyon.

per to fill up his lot for his own convenience. If the land in the vicinity remained in its original state, the proprietor of the plaintiff's lot would have to bear the consequences of putting up a building upon ground so disadvantageously situated. Neither the defendant nor any other proprietor of adjoining lots could be held answerable for the effects produced by water flowing over their ground towards the plaintiff's lot in consequence of the natural formation of the soil. A party building upon a lot so low should furnish means for efficiently draining it, or if that were impossible, he would have to bear the result of his want of foresight in building upon land in such a condition. But, for all that appeared in the case, the means resorted to when the plaintiff's building was erected, may have been amply sufficient to carry off the water. But whether this was so or not, it is clearly shown by the testimony, that the body of water upon the defendant's lot was greatly increased after the cutting off of the drain and culvert referred to, and in my opinion, the change produced by the lawful exercise of the right which the proprietors of the other lots had to put up buildings upon their lots, imposed upon the defendant obligations in respect to his own lot which, but for those causes, would not have existed. His rights are to be taken in connection with the rights of all the adjoining proprietors, and viewing them collectively, an obligation may arise which is the necessary consequence of the levelling and filling in of lots, the erection of buildings, and of the grading and pitch of streets in a new part of the city. The owner of a lot, when changes and improvements are taking place everywhere around him, has no right to insist that his lot shall remain a standing cess-pool for water to collect in, to the serious injury of those who have erected buildings upon the lots which adjoin him, when it is in his power to adopt the same means which they have used to connect with existing drains. I think the charge of the judge, therefore, upon the point, was correct, and that the exception to it was not well taken.

. The instruction contained in the third and fourth propositions submitted by the judge to the jury was justified by the evidence. The defendant was certainly responsible, if the water from the roof of his stable or lumber shed was precipitated close to the plaintiff's wall, and tended to undermine the foun-

dation of the plaintiff's building. No man is justified in so using his own land as to injure the building upon the land of his neighbor, when he can avoid it by the exercise of reason-able and ordinary care.

It is assumed on the part of the defendant that this is a case of mutual or co-operating negligence, as water flowed from the plaintiff's wood shed upon the defendant's lot, close to the line of the plaintiff's lot, and as the plaintiff thus contributed by his own act to swell the body of water resting there, and which caused the injury, that he has no right of action against the defendant; and to the refusal of the judge so to instruct the jury, and to the instruction which he did give upon the point, the defendant excepted. The plaintiff was certainly guilty of negligence in so pitching the roof of his wood shed as to cast the water from it upon the defendant's lot, thus aug-menting the body of water which collected there; but it did not appear from the evidence that the plaintiff's wood shed ex-isted there prior to the year 1856. All that appears in the case is that the defendant saw them there during that year, and the injury to the plaintiff's premises from water from the de-fendant's lot is to be traced back to July, 1855. The plaintiff testified that after every storm from July, 1855, to December, 1856, when he connected with the unfinished sewer in Forty-third street, the water ran into his basement, and that he had to pump it out. The judge therefore had no right to assume that the plaintiff's wood sheds were there during the six months preceding the year 1856, and if any presumption is to be derived from the evidence, it is that they were not. For the injury suffered during the period, and to which he in no way contributed, the plaintiff clearly had a right of action, and of which he would have been deprived if the Judge had charged as requested.

Nor does the fact that the pitch of the roof of the plaintiff's wood sheds tended to augment the body of water which did the injury, necessarily deprive him of all right of action for the injury he sustained after the wood sheds were erected. The mutual or other co-operating negligence which deprives one party of any right of action against the other, is where the act which produced the injury would not have occurred but for the combined negligence of both. There may be mutual negli-

Thomas v. Kenyon.

gence and yet one party have a right of action against the other. If a man negligently lie down and fall asleep in the middle of the public road, and another, failing to exercise ordinary care, should drive over him, the party injured would have a right of action against the other. *Kerrohaker* v. *The Cleveland, Columbus and Cincinnati R. R. Co.* 3 Ohio R. 172, N. S; *Trow* v. *Vermont Central R. R. Co.* 24 Verm. 494; *Davie* v. *Mann*, 10 Mees & Welsby, 545; *Butterfield* v. *Forrester*, 10 East, 60. For though the party lying upon the road was guilty of negligence in going to sleep in such a place, still it was not his act that caused the injury, but the want in the other party of ordinary care, by the exercise of which he could have driven around and avoided the obstacle. On the other hand, if a vehicle is driven at an improper rate of speed through a street, and a passenger who sees it approaching improperly attempts to cross, in the expectation that he will be able to pass before it can reach the spot where he crosses, and he is injured by coming in contact with it, that is a case in which the united negligence of both co-operated and produced the accident which otherwise would not have occurred. Where such is the case, both parties are the joint authors of the act which caused the injury, and the degree or proportion in which each may have contributed to produce it is immaterial, as one is not entitled to have satisfaction from the other for an act which had its origin in their mutual negligence. But if the effect of the negligence of one party was to produce injury to a certain extent in any event; that is, if its effect was to produce a certain amount of injury, even if the other party had been guilty of no negligence at all, then, though the negligence of the other party may have rendered the loss or injury greater than it would otherwise have been, still they are not the joint authors of all that has taken place, and it is possible to distinguish the amount of injury caused by the negligence of the one, from the amount of injury caused by the negligence of the other. In the case which I have put, where collision is produced by the imprudent act of the passenger and the neglect of the driver, the whole damage is the result of their mutual agency, and no part of it can be said to be the result of the act of the one any more than of the act of the other. There may be more fault upon one side than upon the

Thomas v. Kenyon.

other, but the degree of fault is not distinguishable in the damage done, and therefore, there can be no apportionment, and consequently no recovery. But if a certain amount of damage was caused by the act of the defendant, and an ascertainable amount by the act of the plaintiff, it does not follow because the plaintiff by his act increased the amount of his damage, that he is to have no remedy against the defendant for the damage which was caused by the acts of the defendant alone ; and that is exactly the present case.

It is manifest from the testimony that the chief injury to the plaintiff's premises was produced by the water which flowed in such large quantities over the defendant's lot, and lodged upon it, close to the plaintiff's building. It was, as has been shown, mainly owing to the existence of springs in the elevated ground above, and to the cutting off of the existing water courses. The water precipitated from the defendant's lumber shed and from the plaintiff's wood sheds when it rained, undoubtedly increased the whole body of water that collected in such close proximity to the plaintiff's building ; but the contribution from these sources must have been slight as compared with the water that continued constantly to collect there from the other causes. It was possible, therefore, for the jury to form some judgment as to the extent to which the plaintiff had been damaged by the acts of the defendant alone, and I think that in such a case they had a right to discriminate, and hold the defendant responsible for damages arising from causes with which the plaintiff had no agency. I think the instruction given by the judge, therefore, upon this point, was correct.

But though the judge instructed the jury that if the plaintiff's house had been injured, and irrespective of the contribution of water from his own wood shed, he would be entitled to recover for injury done by other waters proceeding from the defendant's premises, he excluded upon the trial, under the defendant's exception, a question asked with the view of showing the amount of water which came from the defendant's woodsheds in proportion to the whole, which was certainly erroneous. Unless the jury had some information as to the proportion of water that came from the plaintiff's wood-sheds, they could not discriminate, and the shutting off of all inquiry upon this

Thomas v. Kenyon.

point must have operated to the defendant's prejudice. For this error, which is the only one I find in the case, a new trial must be granted.

BRADY, J.—The question asked the witness Auld, viz: What relative amount of water to the whole in Mr. Thomas's yard comes from the defendant's lot? should not have been allowed. The witness had stated that he had seen water falling from the wood-shed of the plaintiff on the defendant's land, having been in the defendant's lot when it rained, and there was no pretence that he knew of water running or falling upon the defendant's lot, except that which fell from the shed. He did not state that he knew how many rain-storms had taken place during the period it was alleged, and proved, that the defendant had permitted the water to accumulate on his lot, or that he knew of the violence of such storms. He had seen water falling from the plaintiff's wood-shed often, and nothing more. If he had been asked as to the extent of the water which he saw thus falling, the question would have been proper; but it was much broader, being general, and unlimited as to time. He was to state the relative quantity of water to the whole in the defendant's yard which came from the plaintiff's lot, and he was not shown to possess the necessary knowledge or information on that subject to enable him to express an opinion. The dimensions of the shed had been given, and the plaintiff had admitted that the rain-water ran from his shed upon the defendant's lot, but the quantity was not stated. The dimensions of the shed being known, and the number and character of the rain-storms as to violence being shown, the jury would have had the data by which such quantity could be determined, or the witness being competent thereto, might make and state an estimate. The question which was put to Auld was scientific in its whole breadth and scope, and could not have been answered without some knowledge of laws with which he was not shown to be familiar. The same reasoning applies to the next question asked of Auld. I think the judgment should not be reversed, therefore, for the exclusion of these questions; and there being in the case evidence that some water had fallen from the plaintiff's shed upon the defendant's land, it was the duty of the judge to charge

Thomas v. Kenyon.

the ninth proposition, and upon such proposition it was immaterial what quantity of water was contributed from the plaintiff's shed. The jury were therein told that if they believed that the water which ran from the plaintiff's shed went to swell the water which came from the defendant's lot into the basement of the plaintiff's house, then the plaintiff could not recover, his own negligence contributing to the injury of which he complained. The defendant's neglects in this respect were not dependent upon the quantity of water which came from the plaintiff's shed. His liability was based upon the question whether the plaintiff's house would have been injured by the other water, in consequence of the defendant's gross negligence in not trying to prevent the injury. If the defendant wished to prove the contributions of water from the plaintiff's lot, he should have adopted the proper means of establishing the fact, which he did not do, and he had the advantage of all the proof on that subject in the case. The evidence warranted the finding of gross negligence, and it was upon that theory that the verdict was given. His attention had been called to the injury the plaintiff was sustaining, and he refused to do anything to obviate it, expressing a determination to do as he pleased with his own land.

The judgment should be affirmed.

HILTON, J.—I agree with Judge BRADY, that the witness, Auld, was not shown to possess any knowledge which would justify his giving more than a mere opinion, or guess, respecting the matter inquired of. In this view, I think the questions put to him in regard to the relative quantity of water which came from the plaintiff's shed were properly overruled.

With this single exception, I concur in Judge DALY's opinion.

The judgment should be affirmed.